UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
JB NICHOLAS, KRISTINE RAKOWSKY, and
LIANE NIKITOVICH,

                                                    Plaintiffs,

                          -against-

DONALD J. TRUMP, in his official capacity as
President of the United States, the FEDERAL
EMERGENCY MANAGEMENT AGENCY,
WILLIAM B. LONG, in his official capacity as
Administrator of the Federal Emergency Management
Agency, the FEDERAL COMMUNICATIONS
COMMISSION, and AJIT PAI, in his official capacity
as Chairman of the Federal Communications
Commission,

                                      Defendants.
------------------------------------------------------------------- X

**PROPOSED FIRST
AMENDED
COMPLAINT**

**18-CV-8828 (KPF)**

       Plaintiffs JASON B. NICHOLAS (hereinafter "JB Nicholas"), KRISTINE RAKOWSKY

and LIANE NIKITOVICH, by their attorneys, SIEGEL TEITELBAUM & EVANS, LLP and

GOUTAM U. JOIS, ESQ., as and for their First Amended Complaint against Defendants, allege

the following:

## PRELIMINARY STATEMENT

       1.      On October 3, 2018, the cellular telephones of roughly 225 million Americans

rang out with a loud alarm and vibrated, publicly announcing receipt of a message sent by the

United States government to test the Presidential Alert system.  The alarm continued to sound

and the message remained openly displayed on the screen of these approximately 225 million

cellular telephones until each user manually dismissed, closed or silenced, and thereby

1

acknowledged the test message.  This was more than a momentary annoyance; hundreds of millions of individuals were intruded upon as personal cellular telephones publicly announced and openly displayed—in essence broadcast—a government message that cellular telephone users were compelled to receive, read, and acknowledge.  As detailed below, Presidential Alerts and tests thereof (hereinafter referred to together as "Presidential Alerts") violate the Constitution and laws of the United States.

2.     The basic parameters of the alert system are not in dispute.  Defendants control, regulate, oversee and/or manage the Wireless Emergency Alerts ("WEAs") system whereby multiple classes of alerts are delivered to, received by, and essentially broadcast by cellular telephones in the United States.

3.     There are three basic types of WEA, discussed further below.  The familiar "AMBER Alert" is sent when a minor has been abducted and certain other detailed criteria are satisfied. *See* 47 C.F.R. § 10.400(c). An "Imminent Threat Alert" is sent when a threat, such as a strong storm, is determined to be urgent, severe, and certain, as those concepts are defined in the regulation. *Id.* § 10.400(b).  The third type of WEA, and the one at issue here, is the "Presidential Alert."  *Id.* § 10.400(a).

4.     Presidential Alerts present multiple constitutional and other related legal issues. First, although there are detailed regulatory standards for AMBER Alerts and Imminent Threat Alerts, there are no similar standards for a Presidential Alert.  The governing regulation simply states, "A Presidential Alert is an alert issued by the President of the United States or the President's authorized designee." 47 C.F.R. § 10.400(a).  Consequently, a Presidential Alert can be whatever the President wants it to be.

2

5.      Second, and independently, once the President decides to send a Presidential Alert, which he can do unilaterally, virtually all cellular telephone users are compelled to receive, display, read and manually dismiss it.  But as the Supreme Court has long held, "[n]othing in the Constitution compels us to listen to or view any unwanted communication." *Rowan v. United States Post Office Dep't*, 397 U.S. 728, 737 (1970).  Although users may opt out of AMBER Alerts or Imminent Threat Alerts, they may not opt out of Presidential Alerts. This means, for example, that parents of minor children, who may not understand and/or may be frightened needlessly by alarming Presidential Alerts, have no ability to protect their children from such messages.

6.      Undoubtedly, there are valid reasons for the federal government to maintain a system to issue emergency alerts. But such a system runs afoul of the Constitution to the United States, where, as here, such an alert (i) is subject to no meaningful standards, (ii) can be issued unilaterally under largely undefined circumstances, and (iii) is imposed—without an opt out—on the American population.

7.      Therefore, through their control and implementation of Presidential Alerts, Defendants compel speech and receipt of information in violation of the First Amendment, invade privacy in violation of the First and Fifth Amendments, and infringe on parents' rights to direct the upbringing of their children in violation of the Fifth Amendment to the Constitution of the United States. In addition, Defendants the Federal Emergency Management Agency ("FEMA"), Long, the Federal Communications Commission ("FCC") and Pai violate the Administrative Procedure Act by authorizing, enabling and implementing Presidential Alerts— action that is unlawful as contrary to the Constitution of the United States.

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because claims in this

action arise under the Constitution and laws of the United States, specifically the First and Fifth

Amendments to the Constitution of the United States, and pursuant to 5 U.S.C. §§ 701-706

because claims in this action arise under the Administrative Procedure Act.  This Court has

authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 and authority to award

costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(e) because Defendants are officers

or agencies of the United States and two of the three Plaintiffs reside in this District.

**PARTIES**

10.      Plaintiff JB NICHOLAS resides in New York County. Mr. Nicholas is a journalist

and civil rights activist, focusing on First Amendment rights. Mr. Nicholas has initiated lawsuits

to protect prisoners' rights to political association and collective expression and to protect

freedom of the press against excessive police interference with access to news scenes. Mr.

Nicholas believes that police restrictions on access to news scenes inhibit the free flow of

information and empower the government to control the information and messages that are

disseminated to the public. Mr. Nicholas believes that government control over publicly

available information is expanding, including by limiting access to news scenes and by

arbitrarily revoking press credentials of journalists whose reporting is critical of and/or who

question or challenge the government. Mr. Nicholas believes the government's providing

information to the public via Presidential Alerts is another method by which the government

controls the information that the public receives.  It also privileges government-provided

information. Because Mr. Nicholas cannot opt out of receiving Presidential Alerts, he is injured

by being forced to participate in a government program that is contrary to his sincerely-held and constitutionally-protected political and ideological beliefs. For these reasons, Mr. Nicholas was injured by the October 3, 2018 test and will be injured again by future Presidential Alerts.

11.     Plaintiff KRISTINE RAKOWSKY resides in Kings County. Ms. Rakowsky has a minor son who is four and a half years old. She works as a producer and as a consultant to small businesses and non-profit organizations. Ms. Rakowsky has also spearheaded numerous social justice advocacy initiatives. As an outspoken advocate for social justice who is often critical of government, Ms. Rakowsky is firmly opposed to government actions that limit or control the information the public receives. She believes requiring Americans to receive a particular message from the government undermines the free flow of ideas and is a hallmark of totalitarian, not democratic, government.  Ms. Rakowsky also believes that minor children, such as her son, who have access to, use and/or are in possession of cellular telephones, should not be exposed and subjected to Presidential Alerts since they could be traumatized by Presidential Alerts. Because Ms. Rakowsky cannot opt out of receiving Presidential Alerts on her phones, to which her son has access, she is injured by being forced to participate in, as well as to allow her son to be exposed to, affected by and possibly traumatized by a government program that is contrary to her sincerely-held and constitutionally protected political and ideological beliefs as well as her beliefs regarding how to raise her son.  For these reasons, Ms. Rakowsky was injured by the October 3, 2018 test and will be injured again by future Presidential Alerts.

12.     Plaintiff LIANE NIKITOVICH resides in New York County. She is a fitness instructor and small business owner. Ms. Nikitovich, the daughter of a former officer of the U.S. Navy, comes from a deeply patriotic family and was raised to believe in the importance of the Constitution of the United States and its protections of civil liberties. As an adult, she has

supported organizations such as the American Civil Liberties Union that are dedicated to defending the civil liberties she holds dear. Ms. Nikitovich was also a video activist dedicated to protecting First Amendment liberties, such as the rights to protest and to assemble, which she has repeatedly witnessed being violated. In keeping with her commitment to individual civil liberties and the Constitution of the United States, Ms. Nikitovich strongly opposes the expansion of presidential power in the United States, which she believes has occurred over the past twenty years.  Ms. Nikitovich, therefore, objects, *inter alia*, to the unfettered power the President possesses now and in the future, unless enjoined, to send messages to the vast majority of cellular telephones in the United States.  Because Ms. Nikitovich cannot opt out of receiving Presidential Alerts, she is injured by being forced to participate in a government program that is contrary to her sincerely-held and constitutionally-protected political and ideological beliefs.  For these reasons, Ms. Nikitovich was injured by the October 3, 2018 test and will be injured again by future Presidential Alerts.

13.     Defendant DONALD J. TRUMP is the President of the United States. As the President, Defendant Trump is the sole public official authorized to initiate, or to designate someone to initiate, a Presidential Alert, which is sent to all compatible cellular telephones in the United States. He is sued in his official capacity.

14.     Defendant FEMA, a component of the United States Department of Homeland Security, is an executive agency of the United States government. Defendant FEMA is responsible for the maintenance and implementation of WEAs, the system by which Presidential Alerts are delivered to all compatible cellular telephones in the United States.

15.     Defendant WILLIAM B. LONG is the Administrator of FEMA. Long is responsible for the operation and management of FEMA's programs, including the WEA. He is sued in his official capacity.

16.     Defendant FCC is an independent executive agency of the United States government. Defendant FCC is responsible for regulating commercial mobile service providers, including with respect to the transmission and delivery of Presidential Alerts to all compatible cellular telephones in the United States.

17.     Defendant AJIT PAI is the Chairman of the FCC. As Chairman, Defendant Pai is the chief executive officer of the FCC. His duties include presiding at all meetings and sessions of the FCC, representing the FCC, and generally coordinating and organizing the work of the FCC. He is sued in his official capacity.

## STATEMENT OF FACTS

### October 3, 2018

18.     On October 3, 2018, starting at 2:18 p.m., FEMA conducted the first ever national end-to-end test of WEAs with the Presidential Alert level code.

19.     The FCC authorized the Presidential Alert test in a decision issued July 20, 2018, which granted a limited waiver of certain FCC regulations pertaining to WEAs. FEMA was thereby enabled to implement the test by requiring participation in the test from commercial mobile service providers ("CMSPs") that had previously elected to participate in transmission of WEAs. *See In the Matter of Improving Wireless Emergency Alerts and Community Initiated Alerting and In the Matter of Amendments to Part 11 of the Commission's Rules Regarding Emergency Alert System*, PS Docket No. 15-91 and PS Docket No. 15-94 (F.C.C. July 20, 2018).

20.     A message with the header "Presidential Alert," accompanied by the loud alarm and vibration that accompany other WEAs, such as dangerous weather and AMBER alert messages, was sent out by cell towers across the nation for thirty minutes.  The message stated, "THIS IS A TEST of the National Wireless Emergency Alert System. No action is needed." The following is one example of the test message cellular telephone users received on October 3, 2018:



KAREN ZRAICK, *'Presidential Alert' Goes to Millions of Cellphones Across the U.S.*, N.Y. TIMES (Oct. 3, 2018) at https://www.nytimes.com/2018/10/03/us/presidential-alert-trump.html.

21.     It was expected that the test message would be received by and displayed on the cellular telephones of roughly 225 million people in the United States.

22.     Presidential Alerts are sent out across the whole country at once.

23.     When the test of the Presidential Alert system was sent out across the country, Mr. Nicholas was a passenger in a pickup truck. The test sounded out from the driver's cellular telephone and from Mr. Nicholas's, even though Mr. Nicholas believed he had turned off his cellular telephone. The audio alarms and messages confused the driver.

24.     Mr. Nicholas then went to the local public library in Waterbury, Vermont. When he turned on his cellular phone the Presidential Alert audio alarm sounded again and the message

8

again popped up on his phone. He attempted to turn it off, but it sounded once again, causing

him embarrassment when the librarian reprimanded him to silence his phone.

25.     Mr. Nicholas was not the only person reported to receive the alert test multiple

times. An October 4, 2018 article in *The Washington Post* stated that multiple people reported

receiving the alert test repeatedly, some as many as three to nine times. *See* BRIAN FUNG,

*Cellphone Users Nationwide Just Received a 'Presidential Alert.' Here's What to Know*,

WASHINGTON POST (Oct. 4, 2018) at https://www.washingtonpost.com/technology/

2018/10/03/millions-cellphone-users-are-about-get-presidential-alert-heres-what-know/.

26.     Ms. Nikitovich was in downtown Manhattan when her cellular telephone received

the alert test. It was disruptive. The alarm started blaring from all the cellular telephones around

Ms. Nikitovich and she observed drivers stopping their cars and workers interrupting their tasks

to find and turn off their cellular telephones.

27.     Ms. Rakowsky was at home preparing to go pick up her son from school when

she received the alert test.

## Statutory Background

28.     Multiple statutes and regulations provide the backdrop for Presidential Alerts and

for other WEAs.

29.     The earliest authority for the President's using private sector communications

facilities is the Communications Act of 1934 ("Communications Act"), 47 U.S.C. § 151 *et seq*.

Indeed, FEMA relies on this law and subsequent legislation in its effort to explain to the public

why one cannot "opt out of the Presidential Alert category" of WEA:

> The Communications Act of 1934 established the authority for the President to
> use certain private sector communications systems for priority communications,
> such as sending alert and warning messages to the public, during national
> emergencies. The implementation of this legislation is what enables the

9

Emergency Alert System to be used by government authorities at all levels of government to send alert and warnings via private sector radio, television and cable stations in coordination with the private sector station owners. In 2006, The Warning, Alert, and Response Network (WARN) Act of 2006 prompted the Federal Communications Commission to adopt regulations enabling the wireless industry to participate in the distribution of public alerts and warnings also.  The WARN Act further established that the wireless alerting service may allow wireless subscribers the capability of opting out of receiving WEA alerts, <u>other than an alert issued by the President</u>.

FEMA, THE IPAWS NATIONAL TEST, Frequently Asked Questions, #12, at *https://www.fema.gov /emergency-alert-test* (last accessed Nov. 12, 2018) (emphasis added).

30.     However, FEMA's discussion of the Communications Act glosses over the fact that the Communications Act tightly circumscribed Presidential authority to use private sector communications facilities.  Section 706 of the Communications Act, "War Emergency—Powers of the President," codified at 47 U.S.C. § 606, authorizes priority presidential communications and/or control over communications facilities in three very specific circumstances:

(1) "During the continuance of a war in which the United States is engaged, the President is authorized, if he finds it necessary for the national defense and security, to direct that such communications as in his judgment may be essential to the national defense and security shall have preference or priority with any carrier subject to this Act," 47 U.S.C. § 606(a);

(2) "Upon proclamation by the President that there exists war or a threat of war, or a state of public peril or disaster or other national emergency, or in order to preserve the neutrality of the United States, the President, if he deems it necessary in the interest of national security or defense . . ." may exercise the specified control over stations for radio communications or any device capable of emitting certain types of electromagnetic radiations, 47 U.S.C. § 606(c); and

(3) "Upon proclamation by the President that there exists a state or threat of war involving the United States, the President, if he deems it necessary in the interest of the national security and defense" may exercise the specified control over facilities or stations for wire communication, 47 U.S.C. § 606(d).

31.     Furthermore, the Communications Act distinguishes the President's power to issue priority communications and to control facilities or stations for wire communication from

the President's powers with respect to radio stations and devices that emit certain electromagnetic radiations. The former are limited to "[d]uring the continuance of a war in which the United States is engaged," 47 U.S.C. § 606(a), and during "war or threat of war," 47 U.S.C. §§ 606(c), respectively, while the latter is authorized not only during "war or threat of war," 47 U.S.C. §§ 606(c), but also during "a state of public peril or disaster or other national emergency, or in order to preserve the neutrality of the United States," but only upon a "proclamation by the President" and only if it is "necessary in the interest of national security or defense." 47 U.S.C. § 606(c).

32.     Thus, the presidential powers authorized by the Communications Act differ from Presidential Alerts because (i) the Communications Act authorizes the President to act only under certain clearly defined, specific circumstances (including some circumstances that require an Act of Congress, such as wartime); and (ii) the Communications Act does not require any person to receive, display or broadcast, or in any way acknowledge a communication from the government.

33.     The above-quoted language from FEMA, *see supra* ¶ 29, also invokes the Warning Alert and Response Network Act ("WARN Act"), 47 U.S.C. §§ 1201 *et seq*. The WARN Act is rooted in 2006 Executive Order ("E.O.") 13407, issued on June 26, 2006 by then-President George W. Bush. E.O. 13407 declared, "It is the policy of the United States to have an effective, reliable, integrated, flexible and comprehensive system to alert and warn the American people in situations of war, terrorist attack, natural disaster, or other hazards to public safety and well-being . . . and to ensure that under all conditions the President can communicate with the American people."

34. Like the Communications Act, E.O. 13407 does not require any person to receive, display or broadcast, or in any way acknowledge a communication from the government.

35. The WARN Act was passed shortly after the issuance of E.O. 13407, as Title VI of the Security and Accountability For Every Port Act of 2006, and directed the FCC to adopt "relevant technical standards, protocols, procedures and other technical requirements . . . necessary to enable commercial mobile service alerting capability for commercial mobile service providers that voluntarily elect to transmit emergency alerts." 47 U.S.C. § 1201(a)

36. The WARN Act explicitly provided that Commercial Mobile Service Providers ("CMSPs") could offer subscribers the ability to opt out of receiving emergency alerts "other than an alert issued by the President." 47 U.S.C. § 1201(b)(2)(E).

37. Notably, although individual users cannot opt out of "an alert issued by the President," the WARN Act does not require a CMSP itself to participate in the WEA system. *See* 47 U.S.C. § 1201(b)(1) and (2)(A).  In other words, an individual cannot herself opt out of Presidential Alerts, but a CMSP such as Verizon can decline to participate in the system of WEAs, effectively opting millions of users out of WEAs altogether.

38. Although CMSPs are not required to broadcast WEAs, more than 100 CMSPs— including AT&T, Sprint, T-Mobile, and Verizon, which at the end of 2016 collectively accounted for more than 98 percent of cellular service connections—have agreed to participate in the WEA system. Moreover, even a cellular telephone user whose service provider, such as a mobile virtual network operator that does not operate its own infrastructure, has not elected to participate in the WEA system would receive a WEA if that non-participating provider uses the infrastructure of a CMSP that has elected to participate. *See* DEPARTMENT OF HOMELAND SECURITY, WIRELESS EMERGENCY ALERTS: MOBILE PENETRATION STRATEGY, 69 (July 2013) *at*

https://www.dhs.gov/sites/default/files/publications/Wireless%20Emergency%20Alerts%20Mobile%20Penetration%20Strategy.pdf.

39.     After the WARN Act was passed, the FCC enacted implementing regulations, which are codified at 47 C.F.R. 10.1 *et seq*.

40.     The regulations define the classes of WEA that participating CMSPs are required to receive and transmit: Presidential Alerts, Imminent Threat Alerts, Child Abduction Emergency/AMBER Alerts, and, as of May 1, 2019, Public Safety Messages.

41.     According to 47 C.F.R. § 10.400(a), "A Presidential Alert is an alert issued by the President of the United States or the President's authorized designee."

42.     There are no standards provided in 47 C.F.R. § 10.400 with respect to the circumstances under which the President can issue an alert that participating CMSPs are required to receive and transmit to cellular telephone users.

43.     In contrast, detailed standards are provided with respect to other classes of Alert Message.

44.     According to 47 C.F.R. § 10.400(b), an Imminent Threat Alert "is an alert that meets a minimum value for each of three CAP [Common Alerting Protocol] elements: Urgency, Severity, and Certainty." Specifically, "[t]he CAP Urgency element must be either Immediate (i.e., responsive action should be taken immediately) or Expected (i.e., responsive action should be taken soon, within the next hour);" "[t]he CAP Severity element must be either Extreme (i.e., an extraordinary threat to life or property) or Severe (i.e., a significant threat to life or property); and "[t]he CAP Certainty element must be either Observed (i.e., determined to have occurred or to be ongoing) or Likely (i.e., has a probability of greater than 50 percent)." 47 C.F.R. § 10.400(b)(1)-(3).

45.     AMBER Alerts have even more detailed requirements. According to 47 C.F.R. § 10.400(c), "[a]n AMBER Alert is an alert initiated by a local government official based on the U.S. Department of Justice's five criteria that should be met before an alert is activated." The five criteria are:

    i.   Law enforcement confirms a child has been abducted;

    ii.  The child is 17 years or younger;

    iii. Law enforcement believes the child is in imminent danger of serious bodily harm or death;

    iv.  There is enough descriptive information about the victim and the abduction to believe an immediate broadcast alert will help; and

    v.   The child's name and other data have been entered into the National Crime Information Center.

47 C.F.R. § 10.400(c)(1)(i)-(v). The regulation further specifies that there are four types of AMBER Alert: "Family Abduction; Non-family Abduction; Lost, Injured or Otherwise Missing; and Endangered Runaway." 47 C.F.R. § 10.400(c)(2). Specifically, "[a] Family Abduction (FA) alert involves an abductor who is a family member of the abducted child such as a parent, aunt, grandfather, or stepfather;" "[a] Nonfamily Abduction (NFA) alert involves an abductor unrelated to the abducted child, either someone unknown to the child and/or the child's family or an acquaintance/friend of the child and/or the child's family;" "[a] Lost, Injured, or Otherwise Missing (LIM) alert involves a case where the circumstances of the child's disappearance are unknown;" and "An Endangered Runaway (ERU) alert involves a missing child who is believed to have run away and in imminent danger." 47 C.F.R. § 10.400(c)(2)(i)-(iv).

46.     Section 10.400 of Title 47 of the C.F.R. was amended on November 1, 2016. Effective May 1, 2019 a fourth class of Alert Message, Public Safety Messages, will be required to be received and transmitted by participating CMSPs. "A Public Safety Message is an essential

public safety advisory that prescribes one or more actions likely to save lives and/or safeguard property during an emergency. A Public Safety Message may only be issued in connection with an Alert Message classified in [47 C.F.R. § 10.400(a), (b), or (c), described above]." 81 F.R. 75726.

47.     Currently, cellular telephone users may opt out of the "'Child Abduction Emergency/AMBER Alert,' and 'Imminent Threat Alert' classes of Alert Messages." 47 C.F.R. § 10.280(a). Effective May 1, 2019, CMSPs may also offer customers the ability to opt out of the Public Safety Message class of Alert Messages. 81 F.R. 75725.

48.     No such opt-out provision exists for Presidential Alerts.

49.     In 2016, the Integrated Public Alert and Warning System Modernization Act ("IPAWS Modernization Act"), 6 U.S.C. § 321o, was enacted. This Act amended the Homeland Security Act of 2002 and directed, *inter alia*, "To provide timely and effective warnings regarding natural disasters, acts of terrorism, and other man-made disasters or threats to public safety, the Administrator [of FEMA] shall modernize [IPAWS] to help ensure that under all conditions the President . . . can alert and warn the civilian population in areas endangered by *natural disasters, acts of terrorism and other man-made disasters or threats to public safety.*" 6 U.S.C. § 321o(a) (emphasis added).

50.     Like the Communications Act and E.O. 13407, the IPAWS Modernization Act does not require persons located in the United States to receive or acknowledge any particular warnings. Rather, it directs FEMA to provide the capability to issue emergency warnings.

51.     Under the IPAWS Modernization Act, FEMA is responsible for the development, operation, integration and maintenance of the IPAWS infrastructure, which includes the Emergency Alert System ("EAS") for radio and television, WEAs, National Oceanic and

15

Atmospheric Administration Weather Radios, and other internet-connected services.  In the

future, emergency alerts could be required to be transmitted by computer gaming consoles,

internet search engines, social sharing websites and instant messaging. H.R. Rep., No. 114-900,

at 3 (2016).

52.     Although the IPAWS Modernization Act makes reference to "natural disasters,

acts of terrorism and other man-made disasters or threats to public safety," these terms are not all

defined in the law.

53.     The Homeland Security Act of 2002, which was amended by the IPAWS

Modernization Act, defines terrorism "as any activity that—

> (A) involves an act that—
>        (i) is dangerous to human life or potentially destructive of critical
>        infrastructure or key resources; and
>        (ii) is a violation of the criminal laws of the United States or of any State
>        or other subdivision of the United States; and
>
> (B) appears to be intended—
>        (i) to intimidate or coerce a civilian population;
>        (ii) to influence the policy of a government by intimidation or coercion; or
>        (iii) to affect the conduct of a government by mass destruction,
>        assassination, or kidnapping.

6 U.S.C. § 101(18).

54.     The Homeland Security Act of 2002 does not, however, define "natural disaster,"

or "man-made disaster." Somewhat relatedly, it defines "major disaster," 6 U.S.C. § 101(14), by

reference to the Robert T. Stafford Disaster Relief and Emergency Assistance Act,

42 U.S.C.  § 5122, which states,

> "Major disaster" means any natural catastrophe (including any hurricane,
> tornado, storm, high water, wind-driven water, tidal wave, tsunami,
> earthquake, volcanic eruption, landslide, mudslide, snowstorm, or
> drought), or, regardless of cause, any fire, flood, or explosion, in any part
> of the United States, which in the determination of the President causes
> damage of sufficient severity and magnitude to warrant major disaster

16

assistance under this chapter to supplement the efforts and available resources of States, local governments, and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused thereby.

55.     Because "major disaster" applies only to those events that "warrant major disaster assistance," it is apparently a narrower term than "man-made disaster" or "natural disaster," leaving these latter two terms largely undefined. Consequently, there are no standards to guide the President's discretion to issue an alert for a "natural" or "man-made" disaster.

56.     There is also a considerable lack of clarity as to what kind of man-made disaster or natural disaster would justify a Presidential Alert, which Americans are compelled to receive, broadcast and acknowledge, as opposed to an Imminent Threat Alert, which Americans may choose not to receive at all.

57.     Additionally, neither the Homeland Security Act of 2002 nor the IPAWS Modernization Act contain any definition of "threat to public safety," giving the President nearly unbridled discretion to issue a Presidential Alert in a myriad of circumstances. For example, the current Administration has applied the classification "threat to public safety" as follows:

- On January 25, 2017, mere days after taking office, President Trump issued an Executive Order declaring, "Aliens who illegally enter the United States without inspection or admission present a significant threat to national security and public safety"

- On January 24, 2018, Attorney General Jeff Sessions characterized sanctuary jurisdictions as a threat to public safety, stating "We have seen too many examples of the threat to public safety represented by jurisdictions that actively thwart the federal government's immigration enforcement — enough is enough."

17

- A White House fact sheet issued on July 5, 2018 declares, "Save ICE: Leading Democrats in Congress have called for United States Immigration and Customs Enforcement (ICE) to be abolished, which would grind immigration enforcement to a halt, with devastating consequences for public safety." Later it states, "Abolishing ICE would mean that countless illegal aliens who pose a threat to public safety would be allowed to roam free—killing, injuring, and threatening Americans—instead of being removed from the country."

58.    The IPAWS Modernization Act also calls for the IPAWS to be tested "not less than once every 3 years." 6 U.S.C. § 321o(b)(4)(C). Therefore, the vast majority of cellular telephone users in the United States will, at a minimum, receive a test of the Presidential Alert system that they cannot opt out of at least once every three years.

## FIRST CLAIM

### Violation of Privacy under the First and Fifth Amendments (Captive Audience)

59.    Plaintiffs repeat and reallege each and every allegation set forth above.

60.    The Constitution of the United States, through the First and Fifth Amendment, protects an unwilling listener's right to avoid unwanted communication, which is encompassed in the right to privacy and the right to be let alone.

61.    Courts have recognized that individuals have privacy interests with respect to their personal cellular telephones, which are such a pervasive and important part of daily life that searching them is akin to a top-to-bottom search of the home and tracking them akin to the constant surveillance accomplished by ankle monitors.

62.    Because cellular telephone users, such as Plaintiffs, are unable to opt out of Presidential Alerts, they are made a captive audience.

63.     Defendants violate Plaintiffs' privacy rights to avoid unwanted communication on their cellular telephones through the control and implementation of Presidential Alerts—which are subject to no meaningful standards, can be issued unilaterally by the President in a largely undefined range of circumstances and offer cellular telephone users no ability to opt out.

64.     Presidential Alerts are unconstitutional under the First and Fifth Amendment to the Constitution of the United States, facially and as applied to Plaintiffs with respect to the October 3, 2018 test and future deployments of Presidential Alerts, including future statutorily-mandated tests.

**SECOND CLAIM**

**<u>Violation of First Amendment Rights (Compelled Speech)</u>**

65.     Plaintiffs repeat and reallege each and every allegation set forth above.

66.     The First Amendment to the Constitution of the United States protects the right to speak freely and the right not to speak, including the right not to be forced to host or accommodate another's message.

67.     A regulation or law that compels speech is content-based.

68.     Presidential Alerts are government speech and convey a particularized message that is intended to be broadly understood by all those who receive it.

69.     Presidential Alerts force a cellular telephone user to broadcast the government's message on his/her cellular telephone: Presidential Alerts are accompanied by a loud alarm that attracts attention and are openly displayed on an individual's cellular telephone screen. In so doing, Presidential Alerts draw the attention of anyone in the vicinity and are visible to and can be understood by anyone within viewing distance of the cellular telephone's screen. Presidential Alerts thereby make individuals with cellular telephones instruments for publicly fostering a

19

government message against their will. Cellular telephone users are unable to opt out of receiving and broadcasting Presidential Alerts.

70.     Cellular telephones are highly personal items, which users customize to express themselves, including by personalizing the screen background, often with photos of particular value or importance, by specifying what types of messages, from which particular applications can or cannot pop up on the phone, and by personalizing the phone case. Messages on a cellular telephone may reasonably be associated with the owner of the cellular telephone.

71.     To the extent that Presidential Alerts are reasonably associated with the government , a law that turns a person's "private property into a billboard" for the government's "ideological message" violates the First Amendment. *See Evergreen Association, Inc. v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014) (citing *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). And, "an individual's 'right to tailor [his] speech' or to not speak at all 'applies equally to statements of fact the speaker would rather avoid." *Stuart v. Camintz*, 744 F.3d 238, 246 (4th Cir. 2014) (quoting *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. Of Bos.*, 515 U.S. 557, 573 (1995)).

72.     Defendants, through their control and implementation of Presidential Alerts— which are subject to no meaningful standards, can be issued unilaterally by the President in a largely undefined range of circumstances and offer cellular telephone users no ability to opt out, violate the First Amendment's protection against compelled speech, by forcing cellular telephone users, including Plaintiffs, to host and/or accommodate government speech regardless of their desire not to do so.

73.     Presidential Alerts are unconstitutional under the First Amendment to the Constitution of the United States, facially and as applied to Plaintiffs with respect to the October

3, 2018 test and future deployments of Presidential Alerts, including future statutorily-mandated tests.

## THIRD CLAIM

### Violation of First Amendment Rights
### (Compelled Receipt of Information)

74. Plaintiffs repeat and reallege each and every allegation set forth above.

75. The First Amendment to the Constitution of the United States protects Plaintiffs' rights to freedom of thought. Included in this protection are the rights to speak freely and the complementary right not to speak.

76. Also protected by the First Amendment are the rights to associate and the complementary right not to associate.

77. Similarly, the First Amendment protects the rights to read and receive information and where, as here, it does not infringe on the First Amendment rights of others, the First Amendment protects the right not to read or receive information.

78. Defendants, through the control and implementation of Presidential Alerts—which are subject to no meaningful standards, can be issued unilaterally by the President in a largely undefined range of circumstances and offer cellular telephone users no ability to opt out, force cellular telephone users, including Plaintiffs, to receive information against their will, in violation of the First Amendment.

79. Presidential Alerts are unconstitutional under the First Amendment to the Constitution of the United States, facially and as applied to Plaintiffs with respect to the October 3, 2018 test and future deployments of Presidential Alerts, including future statutorily-mandated tests.

## FOURTH CLAIM

### Violation of Parental Right of Plaintiff Rakowsky to Direct the Upbringing of Her Minor Child under the Fifth Amendment

80.   Plaintiffs repeat and reallege each and every allegation set forth above.

81.   The Fifth Amendment to the Constitution of the United States protects a parent's fundamental liberty and privacy interest in the care, custody, management and direction of the upbringing of her child.

82.   It is increasingly common in the United States for parents to provide their minor children with access to, use of and/or possession of cellular telephones.

83.   Presidential Alerts are delivered to all cellular telephones, including those accessible to and/or used by minor children.

84.   Parents, such as Ms. Rakowsky, cannot prevent their minor children from receiving Presidential Alerts when the children have access to, are using, and/or are in possession of cellular telephones. Presidential Alerts therefore deprive parents, including Ms. Rakowsky, of the right to direct the upbringing of their children in so far as they deprive parents of the ability to protect their children from the blaring and potentially alarming sound that accompanies Presidential Alerts as well as the upsetting and disturbing, or potentially confusing information that may be contained in Presidential Alerts.

85.   Defendants, through the control and implementation of Presidential Alerts—which are subject to no meaningful standards, can be issued unilaterally by the President in a largely undefined range of circumstances and offer cellular telephone users no ability to opt out, deprive Ms. Rakowsky of the ability to control whether, when and/or under what circumstances her minor child will be exposed to a potentially traumatizing message and violate Ms. Rakowsky's fundamental rights.

86.     Presidential Alerts are unconstitutional under the Fifth Amendment, facially and as applied to Ms. Rakowsky with respect to the October 3, 2018 test and future deployments of Presidential Alerts, including future statutorily-mandated tests.

## FIFTH CLAIM

### Violation of Administrative Procedure Act as to FCC and FEMA Defendants
### (Agency Action Contrary to the Constitution)

87.     Plaintiffs repeat and reallege each and every allegation set forth above.

88.     Defendants FCC's and Pai's actions relating to granting a limited waiver of the FCC's WEA rules, specifically 47 C.F.R. §§ 10.400 (classifying emergency alerts), 10.520(d) (limiting use of the WEA common audio attention signal), and 10.530(b) (limiting use of the WEA vibration cadence), to allow FEMA to conduct the October 3, 2018 test of the Presidential Alert system, and Defendants FEMA's and Long's implementation of that test on October 3, 2018 constitute final agency action under the Administrative Procedure Act, 5 U.S.C. § 704.

89.     Defendants FCC's, Pai's, FEMA's and Long's actions in authorizing and/or implementing the October 3, 2018 test of the Presidential Alert system violated the Administrative Procedure Act, 5 U.S.C § 706(2)(B) in that such actions were unlawful as contrary to the First and Fifth Amendments to the Constitution of the United States.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that this Court:

A.     Enter a judgement pursuant to 28 U.S.C. § 2201(a) declaring that Defendants violated the First and Fifth Amendments to the Constitution of the United States and the Administrative Procedure Act through the control and implementation of the program, as enacted, to issue Presidential Alerts to cellular telephone users;

B.    Enjoin Defendants from continuing the program, as enacted, to issue Presidential

Alerts to cellular telephone users;

C.    Award Plaintiffs' attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

D.    Award Plaintiffs such other and further relief as the Court deems just and proper.

Dated: November 30, 2018                    SIEGEL TEITELBAUM & EVANS, LLP
        New York, New York

                                            By: _____/s/_____
                                            Norman Siegel
                                            nsiegel@stellp.com

                                            By: _____/s/_____
                                            Herbert Teitelbaum
                                            hteitelbaum@stellp.com

                                            By: _____/s/_____
                                            Kate Fletcher
                                            kfletcher@stellp.com

                                            260 Madison Avenue, 22nd Floor
                                            New York, New York 10016
                                            (212) 455-0300

                                            GOUTAM U. JOIS, ESQ.
                                            _____/s/_____
                                            99 Wall St., #201
                                            New York, New York 10005
                                            (908) 376-9383
                                            goutamjoisesq@gmail.com

                                            *Attorneys for Plaintiffs*