UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JB NICHOLAS, KRISTINE RAKOWSKY, and LIANE NIKITOVICH,<br><br>                    Plaintiffs,<br><br>                    -v.-<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; WILLIAM B. LONG, in his official capacity as Administrator of the Federal Emergency Management Agency; AJIT PAI, in his official capacity as Chairman of the Federal Communications Commission; FEDERAL EMERGENCY MANAGEMENT AGENCY; and FEDERAL COMMUNICATIONS COMMISSION,<br><br>                    Defendants. | 18 Civ. 8828 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

On October 3, 2018, the federal government conducted the first test of the Presidential Alert system, pushing a test message to mobile phones across the United States (the "October 3 Test"). Plaintiffs JB Nicholas, Kristine Rakowsky, and Liane Nikitovich are among the millions of Americans who received the Presidential Alert, and they have brought this action against Defendants Donald J. Trump, William B. Long, Ajit Pai, the Federal Emergency Management Agency ("FEMA"), and the Federal Communications Commission (the "FCC") (together, "Defendants"),[1] claiming that the Presidential Alert

---

[1]   If this case were to continue against Defendant William B. Long, the current Acting Director of the Federal Emergency Management Agency, Peter T. Gaynor, would have been substituted for him. *See* Fed. R. Civ. P. 25(d) (providing for automatic substitution of public officer with successor).

system violates the First and Fifth Amendments of the Constitution by violating individuals' privacy, compelling individuals to convey government speech, compelling individuals to receive unwanted information, and interfering with a parent's right to direct the upbringing of her child. Plaintiffs also claim that FEMA and the FCC, in authorizing and implementing the test of the allegedly unconstitutional Presidential Alert system on October 3, 2018, acted in violation of the Administrative Procedure Act (the "APA"), 5 U.S.C. ch. 5. Defendants, in turn, have moved to dismiss the action for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). For the reasons set forth in this Opinion, Defendants' motion to dismiss is granted.

## BACKGROUND[2]

### A.   Statutory and Regulatory Background

FEMA administers the Integrated Public Alert and Warning System ("IPAWS"), which allows federal, state, tribal, and local authorities to distribute alerts and warnings about "natural disasters, acts of terrorism, and other man-

---

[2]   The facts contained in this Opinion are drawn primarily from Plaintiffs' Amended Complaint, which is the operative pleading in this case and is referred to in this Opinion as the "Amended Complaint" or "Am. Compl." (Am. Compl. (Dkt. #41)). The Court also draws jurisdictional facts from the Declaration of Gregory M. Cooke, referred to as the "Cooke Decl." (Dkt. #58); the Declaration of Antwane V. Johnson, referred to as the "Johnson Decl." (Dkt. #59); and the exhibits attached to the Declaration of Katie Fletcher, referred to as the "Fletcher Decl." (Dkt. #66). Defendants are permitted to offer extrinsic evidence showing lack of subject matter jurisdiction on a motion brought under Federal Rule of Civil Procedure 12(b)(1), *see Carter* v. *HealthPort Technologies, LLC*, 822 F.3d 47, 57 (2d Cir. 2016), and plaintiffs may come forward with their own evidence to "controvert that presented by the defendant," *see Katz* v. *Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017).

For ease of reference, the Court refers to the parties' briefing as follows: Defendants' opening brief as "Def. Br." (Dkt. #61); Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #62); and Defendants' reply brief as "Def. Reply" (Dkt. #72).

made disasters or threats to public safety." 6 U.S.C. § 321o. Other than "acts of terrorism," which is given a statutory definition under 6 U.S.C. § 101(18), none of the other potential triggering events for the use of IPAWS is defined. IPAWS includes four different emergency alerting systems: (i) Wireless Emergency Alerts ("WEA"); (ii) the Emergency Alert System (the "EAS"); (iii) National Oceanic and Atmospheric Administration Weather Radio; and (iv) the All-Hazards Emergency Message Collection System. (Johnson Decl. ¶ 3). Relevantly, the EAS "provides the President with the capability to provide immediate communications and information to the general public … during periods of national emergency" via radio and television systems, *see* 47 C.F.R. § 11.1, while WEA "refers to the voluntary emergency alert system … whereby Commercial Mobile Service Providers ["CMSPs"] may elect to transmit Alert Messages to the public," *id.* § 10.10.

Under FCC regulations, participating CMSPs are "required to receive and transmit four classes of Alert Messages: [i] Presidential Alert; [ii] Imminent Threat Alert; [iii] Child Abduction Emergency/AMBER Alert; and [iv] Public Safety Message" as part of the WEA system. 47 C.F.R. § 10.400. While the regulation provides specific criteria for the latter three classes of alert messages, *see, e.g., id.* § 10.400(b) (providing that an imminent threat alert must meet "a minimum value for each of three CAP elements: Urgency, Severity, and Certainty"), the only description for a Presidential Alert is "an alert issued by the President of the United States or the President's authorized designee," *id.* § 10.400(a). Moreover, participating CMSPs "may offer

3

subscribers the capability of preventing the subscriber's device from receiving such alerts, or classes of such alerts, *other than* an alert issued by the President." 47 U.S.C. § 1201(b)(2)(E) (emphasis added). Thus, the statutory and regulatory framework provides neither precise criteria limiting the triggering event for a Presidential Alert nor a means by which individuals may refuse to receive Presidential Alerts.

Relevant to this action, FEMA is mandated to "conduct[], not less than once every 3 years, periodic nationwide tests" of IPAWS. 6 U.S.C. § 321o(b)(4)(C). However, the statute does not specify which components of IPAWS, such as the WEA system or the EAS, must be used as part of this nationwide testing. As of the date of the filing of this Opinion, FCC regulations only require participating CMSPs to support monthly tests, periodic interface testing, and State/local WEA testing, *see* 47 C.F.R. § 10.350(a)-(c), none of which involve the Presidential Alert classification (*see* Cooke Decl. ¶ 7). Indeed, FEMA cannot test the President Alert system without either obtaining a waiver order from the FCC or the FCC changing its regulations to allow such testing. (*See id.* at ¶ 8). However, use of the Presidential Alert system in the case of an emergency does not require any prior waiver or other regulatory permission.

**B.     Factual Background**

On July 20, 2018, the FCC granted FEMA a limited waiver in order to allow the agency to conduct a nationwide test of the WEA system using the President Alert classification. (Am. Compl. ¶ 19). On October 3, 2018, FEMA conducted the nationwide test of the Presidential Alert system. (*Id.* at ¶ 18).

4

Cell phones across the country received a message with the header "Presidential Alert," accompanied by a loud alarm and vibration. (*Id.* at ¶ 20). The message stated, "THIS IS A TEST of the National Wireless Emergency Alert System. No action is needed." (*Id.*). Plaintiffs all received the alert on their phones, with two of the Plaintiffs considering the alert to be disruptive. (*Id.* at ¶¶ 23-27).

## C. Procedural Background

Plaintiffs initiated this action *pro se* on September 26, 2018, with the filing of a Complaint and a motion for a preliminary injunction. (Dkt. #1, 3). On October 2, 2018, the Court ordered a hearing on the application for emergency relief (Dkt. #5), and on October 3, 2018, the Court held said hearing and denied Plaintiffs' motion for a preliminary injunction (Dkt. #6). On October 4, 2018, Plaintiffs engaged counsel. (Dkt. #7).

On November 30, 2018, Plaintiffs both moved to add FEMA, the FCC, and Ajit Pai as defendants to this case (Dkt. #28) and sought to file an Amended Complaint (Dkt. #30). However, the Amended Complaint was rejected as deficient (Minute Entry of November 30, 2018), as was a subsequent attempt to file an Amended Complaint on December 4, 2018 (Dkt. # 31; Minute Entry of December 4, 2018). On December 28, 2018, the case was stayed due to a lapse in funding to the United States Department of Justice (Dkt. #33), but the stay was lifted on January 30, 2019 (Dkt. #36). On February 20, 2019, Defendants indicated that they had no opposition to amendment of the Complaint and addition of Defendants FEMA, the FCC, and

5

Pai. (Dkt. #39). An Amended Complaint was filed that same day. (Dkt. #40-41).

On March 20, 2019, Defendants requested a conference to discuss their anticipated motion to dismiss (Dkt. #51), to which Plaintiffs responded on March 25, 2019 (Dkt. #53). The Court set a briefing schedule for Defendants' motion to dismiss on March 27, 2019. (Dkt. #54). Defendants filed their motion to dismiss, along with supporting declarations and a memorandum, on May 10, 2019. (Dkt. #57-60). Plaintiffs filed their opposing memorandum, with supporting declarations, on June 24, 2019. (Dkt. #62-66). They then filed a supplemental letter on June 28, 2019. (Dkt. #68). Defendants filed their reply memorandum on July 15, 2019. (Dkt. #72).

## DISCUSSION

**A.     Applicable Law**

   **1.     Motions to Dismiss Under Fed. R. Civ. P. 12(b)(1)**

Defendants claim that Plaintiffs lack standing to pursue their claims for prospective relief, and that therefore this Court must dismiss the action pursuant to Rule 12(b)(1). (*See* Def. Br. 1). Rule 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States,* 201 F.3d 110, 113 (2d Cir. 2000)).

The Second Circuit has drawn a distinction between two types of Rule 12(b)(1) motions: (i) facial motions and (ii) fact-based motions. *See Carter* v. *HealthPort Technologies, LLC,* 822 F.3d 47, 56-57 (2d Cir. 2016); *see also Katz* v. *Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Carter*, 822 F.3d at 56. A plaintiff opposing such a motion bears "no evidentiary burden." *Id.* Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[ ] facts that" establish subject matter jurisdiction. *Id.* (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)). And to make that determination, a court must accept the complaint's allegations as true "and draw[ ] all reasonable inferences in favor of the plaintiff." *Id.* at 57 (internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Carter*, 822 F.3d at 57; *see also MMA Consultants 1, Inc.* v. *Rep. of Peru*, 719 F. App'x 47, 49 (2d Cir. 2017) (summary order) (defining fact-based Rule 12(b)(1) motion as one where "the defendant puts forward evidence to challenge the factual contentions underlying the plaintiff's assertion of subject-matter jurisdiction"). "In opposition to such a motion, [a plaintiff] must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the[ir p]leading if the

7

evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz*, 872 F.3d at 119 (internal citations and quotations omitted). If a defendant supports his fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

### 2. Article III Standing

Federal courts are courts of limited jurisdiction, "and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Platinum-Montaur Life Scis., LLC* v. *Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 616 (2d Cir. 2019). Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" thereby "restrict[ing] the authority of federal courts to resolving 'the legal rights of litigants in actual controversies.'" *Genesis Healthcare Corp.* v. *Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted) (quoting *Valley Forge Christian College* v. *Americans for Separation of Church and State, Inc.*, 454 U.S. 471 (1982)). The "Case" and "Controversy" requirement places the burden on "those who invoke the power of a federal court to demonstrate standing — a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Already, LLC* v. *Nike, Inc.*, 568 U.S. 85, 90 (2013). Courts are to be mindful that the "standing inquiry has been especially rigorous when reaching the merits of a dispute would force [the Court] to

decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Am. Civ. Liberties Union* v. *Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) (quoting *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

In order to satisfy the first prong of standing — that the plaintiff has suffered an "injury in fact" — the plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Moreover, "[t]o establish standing to obtain prospective relief, a plaintiff 'must show a likelihood that he will be injured in the future.'" *Carver* v. *City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (quoting *Shain* v. *Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). Either there must be a "substantial risk" that the future injury will occur, or the threatened injury must be "certainly impending." *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014). "'[A]llegations of *possible* future injury' are not sufficient," *Amnesty Int'l*, 568 U.S. at 409, nor is "past exposure to illegal conduct," *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 102 (1983) (internal brackets omitted) (quoting *O'Shea* v. *Littleton*, 414 U.S. 488, 495 (1974)).

### 3. Sovereign Immunity and the APA

The instant action also implicates principles of sovereign immunity. "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block* v. *North Dakota ex rel. Bd.*

*of Univ. and School Lands*, 461 U.S. 273, 287 (1983).  And "[t]he waiver of sovereign immunity is a prerequisite to subject-matter jurisdiction[.]" *Presidential Gardens Assocs.* v. *U.S. ex rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 139 (2d Cir. 1999) (citing *United States* v. *Mitchell*, 463 U.S. 206, 212 (1983)).  "The APA generally waives the Federal Government's immunity from a suit 'seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).  In particular, the APA provides a reviewing court with the power to "hold unlawful and set aside agency action, findings, and conclusions found to be ... contrary to constitutional right, power, privilege or immunity."  5 U.S.C. § 706(2)(B).  However, the APA's waiver of immunity "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff."  *Patchak*, 567 U.S. at 209 (quoting 5 U.S.C. § 702).  This "provision prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes."  *Id.*

**B.     Analysis**

    **1.     Plaintiffs Lack Standing to Pursue Their Constitutional Claims**

Defendants argue that Plaintiffs lack standing to bring their constitutional claims.  (*See* Def. Br. 8).[3]  Plaintiffs predicate standing primarily

---

[3]     Although Defendants broadly argue in their briefing that Plaintiffs' claims fail for lack of standing, the Court reads Defendants' standing arguments to pertain only to Plaintiffs' constitutional claims, given the lack of any specific reference to standing in relation to

on the assertion that FEMA must test the Presidential Alert system at least once every three years due to 6 U.S.C. § 321o(b)(4)(C)'s requirement that the agency "conduct[], not less than once every three years, periodic nationwide tests." (*See* Pl. Opp. 5-6). They reason that because Presidential Alerts are the only class of WEA alerts that can be sent nationwide, and because § 321o(b)(4)(C) mandates "nationwide tests," FEMA must, as a matter of statutory requirement, conduct a test using the Presidential Alert classification at some point in the next three years. (*See id.*). If this were the case, Plaintiffs would likely succeed in showing that their threatened injury is "certainly impending." *See Driehaus*, 573 U.S. at 158. However, Plaintiffs misunderstand what § 321o(b)(4)(C) requires.

As already mentioned, § 321o(b)(4)(C) does not specify which components of IPAWS FEMA is required to test. All the statute provides is that the test be nationwide. *See* 6 U.S.C. § 321o(b)(4)(C). Although FEMA's own materials note that the Presidential Alert classification is the only class of WEA alerts that can be sent nationwide (*see* Fletcher Decl., Ex. 2 at 3), § 321o(b)(4)(C) does not mandate that FEMA satisfy its testing obligation using the WEA system. IPAWS also includes the EAS (*see* Johnson Decl. ¶ 3), and the EAS can be and is tested nationwide (*see* Fletcher Decl., Ex. 1 at 2). Indeed, Plaintiffs' own exhibit acknowledges that the nationwide test on October 3, 2018, included "the fourth nationwide EAS test." (*See* Fletcher Decl., Ex. 1 at 2). Given that

---

Plaintiffs' APA claim. In other words, the Court will not address an argument regarding standing under the APA that Defendants have not made.

11

FEMA can satisfy its testing obligation under § 321o(b)(4)(C) by conducting nationwide tests of the EAS, Plaintiffs' assertion that Defendants *must* test the Presidential Alert system at some point in the next three years is simply incorrect.  Lacking any other allegation that the federal government will be testing the Presidential Alert system in the near future, Plaintiffs have failed to show any risk of future injury that is not "conjectural or hypothetical."  *See Spokeo*, 136 S. Ct. at 1548.

Plaintiffs argue, in the alternative, that even if FEMA is not statutorily required to test the Presidential Alert system at least once every three years, Plaintiffs still face a "substantial risk" of a future test.  (*See* Pl. Opp. 10). Plaintiffs point to FEMA's prior test of the Presidential Alert system, as well as FEMA statements indicating that testing of the system was "necessary," as evidence of this substantial risk, and argue that these facts make their situation analogous to those presented in cases such as *Driehaus* and *Sierra Club* v. *Jewell*, 764 F.3d 1 (D.C. Cir. 2014).  (*See id.* at 10-11).[4]

Plaintiffs' citations to authority are unhelpful here.  In *Driehaus*, the petitioner was a pro-life advocacy organization accused of making false statements during an election campaign in violation of an Ohio statute.  *See* 573 U.S. at 152-54.  Although the Ohio Elections Commission found probable cause that the petitioner had violated the statute, the complaint was

---

[4]  Plaintiffs also cite to *Davis* v. *Federal Election Commission*, 554 U.S. 724 (2008) (*see* Pl. Opp. 10-11), but the Court does not find the case instructive, since it precedes the Supreme Court's clarification of the "injury in fact" doctrine in *Clapper* v. *Amnesty International USA*, 568 U.S. 398, 410 (2013).

12

withdrawn before any charges could be brought. *See id.* at 155. Nevertheless, the Supreme Court found that petitioner had standing because there was a substantial risk of future enforcement of the statute against the petitioner. *See id.* at 164. The Supreme Court relied on the facts that the petitioner had expressed the intention to make similar statements in the future; the Ohio statute arguably covered petitioner's conduct; and the Elections Commission had already begun enforcement proceedings against the petitioner in the past. *See id.* at 161-64. However, the Court refused to decide whether the threat of Elections Commission proceedings alone was sufficient to give rise to an Article III injury. *Id.* at 166.

*Sierra Club*, wherein various environmental organizations sought to keep a battlefield on the National Register of Historic Places in order to prevent surface coal mining on the site, *see* 764 F.3d at 3-4, is similar to *Driehaus*. There, the D.C. Circuit found that the plaintiffs' asserted injuries qualified as imminent both because surfacing mining had already occurred pursuant to two active permits, both of which covered territory within the battlefield site, and because the coal companies had expressed their intention to mine in the battlefield. *See id.* at 7-8.

Neither case is apposite here. Neither FEMA, nor the FCC, nor any federal agency or official has expressed an intention of engaging in the challenged conduct at any point in the future, unlike the petitioner in *Driehaus* or the coal companies in *Sierra Club*. Moreover, Defendants' prior statements do not, in fact, indicate that the risk of future tests is substantial. All FEMA

13

has said is that the October 3 Test was "necessary to determine if carrier WEA configuration, systems, and networks can and will process a Presidential WEA." (*See* Fletcher Decl., Ex. 10). This statement explains why the first test was necessary — it offers no evidence supporting the proposition that FEMA will test the system again in the near future.

Instead, the only evidence supporting a substantial risk of a future test is that FEMA tested the system once before. But this is not enough to entail a substantial risk of future harm. The *Driehaus* Court took the threatened Elections Commission proceedings into account not simply because the Elections Commission had already initiated proceedings once before, but also because such proceedings could be initiated by anyone — raising the risk of frivolous or opportunistic complaints — and were "not a rare occurrence." *See* 573 U.S. at 164. These facts made "the prospect of future enforcement … far from imaginary or speculative." *See id.* at 165 (internal quotation marks omitted). Here, by contrast, tests using the Presidential Alert classification *are* a rare occurrence — since the passage of § 321o(b)(4)(C) in April 2016, only the one test at issue has occurred — and FEMA is incapable of simply initiating a test frivolously or without warning because it requires a waiver order from the FCC in order to do so (*see* Johnson Decl. ¶ 10). Thus, there is no evidence showing a substantial likelihood of an imminent test. Plaintiffs' asserted future injury "is layered with hypothetical and nowhere near certain." *See Swanigan* v. *City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (finding no substantial risk where plaintiff only asserts that "he *might* be pulled over, arrested, and

14

again subjected to an unconstitutionally long detention"). The Court may not find standing based merely on speculation as to what FEMA might do, never mind what the FCC will do with any potential request FEMA might make for a waiver order. *See Amnesty Int'l*, 568 U.S. at 413 (expressing the Supreme Court's "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

Finally, Plaintiffs claim that they face a substantial risk of injury not from a test of the Presidential Alert system, but from a Presidential Alert issued by the President himself. (*See* Pl. Opp. 12). Plaintiffs argue that given the lack of clear statutory standards demarcating the proper triggering events for such an Alert, there is a threat of a Presidential Alert being issued at any time. (*See id.*). Plaintiffs point in particular to the fact that § 321o(b)(4)(C) provides that alerts can be issued for a "threat to public safety," and allege that the President has referred to immigrants, sanctuary jurisdictions, and Congressional Democrats as threats to public safety. (*See id.* at 12-13). To support this argument, Plaintiffs rely on *Doe No. 1* v. *Putnam County* (*see id.* at 12),[5] in which a plaintiff challenged the constitutionality of a New York State law that mandated that the name and address of any applicant for a firearms license would be a public record. *See* 344 F. Supp. 3d 518, 523-24 (S.D.N.Y. 2018). There, the district court found an alleged injury in fact because "the release of

---

5  Plaintiffs also cite to *Cutshall* v. *Sundquist*, 193 F.3d 466 (6th Cir. 1999) (*see* Pl. Opp. 12), but the Court finds the citation to be unpersuasive, both because it is from outside this Circuit and because it significantly precedes the Supreme Court's decision in *Amnesty International*.

15

Doe No. 1's name, address, and status as a handgun permit holder [could] take place anytime someone requests the information, and Doe No. 1 faces a specific threat of being subject to the release of this information every day." *Doe No. 1*, 344 F. Supp. 3d at 530.

The Court finds this case as well to be inapposite. In *Doe No. 1*, there was a very real risk of the plaintiff's information being disclosed to the public. Indeed, a local newspaper had already attempted to gain such information from the defendant, and there was a decision from the New York State Appellate Division upholding the newspaper's right to have the information disclosed. *See Doe No. 1*, 344 F. Supp. 3d at 524. Moreover, the defendant had noted that it intended to comply with the Appellate Division's order in the future. *See id.* Under such circumstances, it was reasonable for the district court to find that at any time, someone could request disclosure of the plaintiff's information and that the defendant would comply immediately with the request.

By contrast, there is no history indicating a risk that the President might issue a Presidential Alert at any time. Indeed, since President Trump's inauguration, the nation has experienced several natural disasters, including major hurricanes in Texas, Louisiana, and Puerto Rico, *see* Robinson Meyer, *What's Happening With the Relief Effort in Puerto Rico?*, The Atlantic (Oct. 4, 2017), http://theatlantic.com/science/archive/2017/10/what-happened-in-puerto-rico-a-timeline-of-hurricane-maria/541956/; Maggie Astor and Niraj Chokshi, *Hurricane Harvey: The Devastation and What Comes Next*, N.Y. Times (Aug. 28, 2017), http://nytimes.com/2017/08/28/us/hurricane-harvey-

16

texas.html; and the largest wildfire season in California's history, *see* Dennis Romero, *California had nation's worst fire season in 2018*, NBC News (Mar. 9, 2019, 7:28 PM), http://nbcnews.com/news/us-news/california-had-nation-s-worst-fire-season-2018-n981431, none of which has prompted a Presidential Alert. Much as the Court is entitled to consider past wrongs as evidence of whether Plaintiffs face "a real and immediate threat of repeated injury," *see Lyons*, 461 U.S. at 102, the Court may likewise consider the fact that there is no history of the President issuing a Presidential Alert. In the end, Plaintiffs ask the Court to find standing based on the assumption that the President will abuse the Presidential Alert system. The Court will not rely on such an assumption, and Plaintiffs have thus failed to show that they have standing to bring their constitutional claims.

### 2. Plaintiffs' APA Claims Are Barred

Plaintiffs' fifth claim is that Defendants FEMA, FCC, Long, and Pai violated the APA by authorizing a test of the allegedly unconstitutional Presidential Alert system. (*See* Am. Compl. ¶¶ 87-89). Notably, Plaintiffs challenge the limited waiver that the FCC granted on July 20, 2018. (*See id.* at ¶ 88).[6] Defendants argue that Plaintiffs' APA claim is barred because, under

---

[6] It is unclear from Plaintiffs' Amended Complaint whether Plaintiffs also challenge the actual test on October 3, 2018, under the APA, as opposed to just the issuance of the waiver order. Moreover, Plaintiffs do not discuss any such claim in their opposing papers, and Defendants only raise the issue in a footnote (*see* Def. Br. 14 n.4). However, insofar as Plaintiffs do challenge FEMA's test of the system under the APA, that claim has been rendered moot by the completion of the test. *See Benzman* v. *Whitman*, 523 F.3d 119, 132 (2d Cir. 2008) (holding that a "completed cleanup program [could not] be effectively remedied under section 706(2) because a court cannot undo a completed program); *City of Houston* v. *Dep't of Hous. and Urban Dev.*, 24 F.3d 1421, 1429-30 (D.C. Cir. 1994) (explaining that "[w]hen a plaintiff's specific claim is moot," a

17

the terms of the APA, this Court does not properly have jurisdiction over the claim.  (*See* Def. Br. 15-16).

Defendants are correct.  As previously mentioned, the APA only provides a right of review insofar as no other statute "that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  And Congress has provided an alternative mechanism for challenges to final orders[7] of the FCC: 47 U.S.C. § 402(a), which provides that any proceeding challenging an FCC order "shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28."  That statute, in turn, vests exclusive jurisdiction to enjoin or determine the validity of final FCC orders in the Courts of Appeals.  *See* 28 U.S.C. § 2342(1).  Moreover, such a challenge must be brought within 60 days of the final order's entry "in the court of appeals wherein venue lies."  *Id.* at § 2344.  For reasons of both improper jurisdiction, *see Kahn* v. *iBiquity Digital Corp.*, No. 06 Civ. 1536 (NRB), 2006 WL 3593266, at *3 (S.D.N.Y. Dec. 7, 2006) (explaining that "a district court may review neither the FCC's regulatory actions nor the outcome of those actions"), *aff'd*, 309 F. App'x 429 (2d Cir. 2009) (summary order), and timeliness (*see* Dkt. #1 (showing that the original complaint was filed on September 26, 2018, over 60 days after the FCC's order of July 20, 2018)), this Court may not review Plaintiffs' APA claim

---

claim for declaratory judgment is also mooted unless the specific agency action challenged falls within one of the exceptions to mootness or the plaintiff has standing to attack future applications of a challenged agency policy).

[7]  Both parties concede that the July 20, 2018 order issuing the limited waiver constituted a "final order," or "final agency action." (*See* Am. Compl. ¶ 88; Def. Br. 15).

challenging the FCC's waiver order. Congress has, through 47 U.S.C. § 402 (and, by incorporation, 28 U.S.C. §§ 2342(1) and 2344), provided an express bar against Plaintiffs' claim, and Plaintiffs may not sidestep that bar by invoking the APA.

Moreover, Plaintiffs' citations to authority are unavailing, given that they only support Plaintiffs' constitutional attacks against the general statutory and regulatory scheme providing for Presidential Alerts. (*See* Pl. Opp. 23-24 (arguing that district courts may have jurisdiction over claims challenging "the constitutionality of the enabling statute on its face)). As already discussed, Plaintiffs lack standing to challenge the constitutionality of the Presidential Alert system.

In sum, this Court does not have subject matter jurisdiction to proceed with this action. Plaintiffs have failed to allege plausibly that they will be injured in the future by Defendants and therefore have no standing to bring claims against any future action by Defendants. Additionally, Plaintiffs cannot challenge Defendants' prior authorization of the October 3 Test because the APA bars such a claim, and there is thus no valid waiver of sovereign immunity. Accordingly, the Court must dismiss this action.

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:   January 14, 2020
         New York, New York

                                        KATHERINE POLK FAILLA
                                        United States District Judge